Victoria Anderson v. Discovery Communications, LLC You're ready, we'll hear from you. Good morning. May it please the court, my name is Elaine Fitch. And I'm here with Calgarvy, Chusey, Newman, and Fitch from Washington. Did you have a motion to file corrected briefs? Was that your? That was our motion, yes. It was a joint motion between the parties. The corrected briefs? Did we rule on that? I don't think we have. Anyway, we'll grant that. We'll take your corrected briefs. You correct the pagination and both of you agree on that. I'm just saying I want the incorrect version. We agree to it. Just for a point of clarification, would you like us to resubmit them in the hard copy format or is the filed copy sufficient? Do you have hard copies? I did not bring hard copies. Have they been made, printed? No. I think we were waiting to hear what the ruling was and if you wanted hard copies we would. Well, what are we supposed to look at? Some of these guys really work off of computers, but I'm sort of a Luddite. I go back and I have scribes back there copying by hand. It is in your hands. While we grant it, I want you to submit the briefs and just enough whatever the clerk wants in the normal course. Okay, very good. Thank you. And I represent the appellant, Ms. Victoria Anderson, who is here today. Ms. Anderson challenges the District Court's grant of summary judgment on her ADA, her Montgomery County Human Rights Act, and her FMLA claims. Ms. Anderson contends that Discovery violated the FMLA when it denied her intermittent leave, even though she had notified them that she needed a modified work schedule for a serious health condition. Ms. Anderson also contends that Discovery retaliated against her under the ADA and the Montgomery County Human Rights Act when she requested a reasonable accommodation and they terminated her for doing so. What was her serious health condition? She had a sleep disorder that has been variously described as... But not apnea. That is not in the record. What do you mean that's not in the record? There is no evidence of apnea in the record. Is the only record the one doctor's opinion that she visited? The reason that I ask is I didn't see any objective evidence that confirmed a serious disorder. They did a sleep test. Right, they did a sleep study. But she did sleep seven hours during that sleep test. And so that doesn't confirm it. And I'm assuming she's able to make some kind of case, but I'm not convinced that this wasn't more than stress and tension over a period of time. She may have been overworked and just needed a good weekend. Well, except it had been going on for a very long time, starting in May 2006. Right, she had gone to see a doctor out in California, Dr. Bailey Walton. She had gone to see her primary care physician after returning to the D.C. area. She had gone to see Dr. Tucker, who was a sleep specialist. And then she had the sleep study, which is also not in the record. But during the day she could function. She just didn't sleep at night. During periods. There is various testimony at points where she said, even though I'm only sleeping two to three hours at night, I'm still functioning fine during the day. I think you would probably encounter certain doctors who would question that. And there were other times when she said she was not functioning well throughout the day. What do you mean certain doctors would question that? What does that mean? Well, I think if you look at what the National Institute of Health says and the Sleep Foundation, there are a lot of ramifications for people who are not sleeping very well. No, wait a second now. Judge Niemeyer said she said she could function during the day. And you said a lot of doctors would challenge that. What does that mean? Is that in the record? Yes. It's based upon the National Institute of Health and the Sleep Foundation. But you mean doctors would challenge her statement that she could function? Well, I think that's a possibility because there are a lot of... Because they would say, well, she's not telling the truth? No. But the perception of how one's functioning and how one may actually be functioning could be different. And that's what most of these studies, these foundations are finding out, is that the impact that a lack of sleep has... Wait a minute. Wait, wait, wait. If it is true that the facts are, just accepting for a minute that they are, and she says, I can function during the day, no court would recognize any study that says, no, she can't function during the day, do you think? Absent something more? Absent something more, yes. They would not recognize that? Correct. But here's what we're looking at. We're looking at a substantial impairment in her ability to sleep, not her ability to function during the day. And the EEOC has come out in its... It was question 11 of the Enforcement Guidance on Psychiatric Disabilities, and it specifically said that an individual who sleeps two to three hours per night for, I believe it was more than a couple of months, because of, they used the example of depression, would be considered substantially impaired in the ability to sleep. Is there any evidence that she falls in that category of sleeping two to three hours a night? Absolutely. There's no dispute in the record other than this one reference to a one-night sleep study that she's been sleeping two to three hours. What does this go to one way or the other, though? I mean, does this go to your ADA claim, your FMLA claim? I'm not sure what this means for you. Well, that only goes to the failure to accommodate claim. The only time that she needs to prove that she's disabled is under the failure to accommodate claim,  So I think... So wait a second. Now, you say the record indicates that she was sleeping two to three hours a night? Yes. And although she doesn't say that that impacted her job performance, you say there's evidence in the record from somebody saying it did? There were points when she was saying that it didn't impact her. There are other points when she was saying she was being impacted, that she was glazed over, that she was fatigued, that she was experiencing difficulties during the daytime. From 1.30 to 3.30 in my office, that's my experience. We don't want to talk about nap time. Well, all the populace basically, I think, has some sort of sleep problem. I mean, you're not going to have a country of 300 million ADA or FMLA claims. No, but what you need to look at is whether somebody is significantly impaired as compared to the general population. And the studies that are out there reflect that the general population sleeps between about seven to nine hours. So if you're looking at somebody who's sleeping only two to three hours, that is a significant difference. And again, the EEOC has said that that is a substantial impairment. I'm assuming you wouldn't be talking about these studies if they weren't somewhere in the record that you'd put into evidence. I mean, so what? How does that end up being some sort of expert evidence that verifies the claim on behalf of your client? Well, it's expert evidence. I mean, it's the evidence that's out there about what the average person does. So what you have to compare it to is what Ms. Anderson was actually doing. And comparing two to three hours to seven to nine. Who did that? I'm sorry? Who did that? Who did what? Who made the comparison? I'm making the comparison. Okay, so there's no physician that did that. There's no psychiatrist that did that. You're giving us your medical opinion on what it means? I'm looking at what the EEOC has said. I'm looking at what these various studies done by these professionals have concluded about the impact that a lesser amount of sleep is having. Let me just, it's a little adjunct, it's a little collateral to it, but my question is let's assume she got some fatigue during some times of the time she functioned well. She's out in California and she sends an e-mail back and said, I shouldn't be flying. My doctor told me not to fly. And so I have to stay out here for a few days until I can fly. And she has her secretary or assistant send an e-mail that says, I'm unavailable by e-mail, text, or telephone, or whatever. You can't reach me. What's that all about? That was consistent. That absence of response was consistent with the employer's concern, in this case, over a lot of things. But it is so egregious compared to the others, why she couldn't have a telephone call or send an e-mail and said, I'm here, I'm groggy, I'm taking this medicine, I'm seeing this doctor, I'll be back, this, that. Zero explanation, which is part of this communications and part of this lost trust. I mean, the question is, is she part of the team or not? Well, what she was doing was announcing to her clients that she would not be available to them at that time so that they would know to contact a backup person. I'm talking about her superiors, supervisors. Correct. She didn't tell them at all. Well, she notified them that she was out sick. And I can't be reached by telephone, e-mail, text, computer, or anything. That's what she said in the e-mail, right? What was the language? That was basically the language. But that wasn't meant that her supervisors couldn't contact her. It was that she was not available to work on deals for her clients. What does it mean when you say, I'm unavailable through any of those means? Just don't use the text, don't use the computer, don't use the telephone. I can't be reached. So that her clients wouldn't contact her, that they would contact the backup person, so that they would know who to get in touch with when they needed something done. And I think where this takes us is... But I don't understand why she couldn't handle business from out there. Because she was sick. What do you mean she was sick? Where's that in the record? It's just a blank four days in California. Well, she'd gone to see Dr. Bailey Walton on October 12th. Yeah, and what did he say and do? He was the one, she was the one that recommended taking time off of work. She was the one that said, I think you need to have some follow-up care because of your sleep problems, your anxiety, and diagnosed with a dysthymic disorder. Was that a medical doctor? Yes. And that doctor said, don't fly? Well, there was an earache involved, a flu-like symptom. So yes, until that resolved. And then Ms. Anderson was supposed to... And then she could fly after the earache was resolved. Now, why couldn't she text or e-mail and stay off of her business during that time? She was on company business out there. She was out there for a conference. Right. Right. That was October 12th to 14th. Right, right. And then she stayed out another bunch of days without telling anybody, explaining to anybody, and they were upset by that. I would disagree that she didn't tell anybody. She contacted her secretary, asked her secretary to send out this message, and then the minute Ms. Coles contacted her, they were in immediate correspondence talking about this. But I think what you're looking at here is the pretext argument. And that, you know, in its briefs, Discovery has raised a tremendous number of reasons why it claims now that it terminated Ms. Anderson. You say there were a number of reasons. They were all the same reasons. They were all focusing on the same symptoms. They just characterized them differently, and they wanted to characterize them in some way that was most pertinent to Anderson. But she would respond to confirmation of a time. She'd put in a different time, a deadline, a different deadline. She wouldn't state accurately what was her schedule, why she was off. And then she goes to California and she says, I have an earache, I can't fly back, and says, I'm not in contact with anybody. Don't be in contact with me at all. But that wasn't why she was terminated. She was terminated for not being trustworthy. You couldn't trust this employee because you didn't know what you were dealing with. Is she telling the truth? Is she malingering? Is she trying to get out of this? She's got a problem, but why doesn't she come up and tell us about it in an accurate fashion? And they have email after email about where the emails just don't click. The untrustworthiness is tied exclusively to the time discrepancies. That is the reason they- That's part of the symptoms of her relationship. Sorry, my time has run out. She didn't report accurately her work at home. She didn't report accurately. She didn't confirm meetings accurately. Somebody said, this is your deadline, and she'd write back a different one. But none of that is why they terminated her. It is. There are disputes of fact in the record about why they terminated her. I beg to differ because I read that, and I think they're describing exactly that. They're just giving, in different contexts, giving different words for it, whether it's trustworthy, whether it's reliability, whether it's responsiveness, whatever, how you want to characterize it. They're looking at the same incidents and describing those incidents. And I don't know why that was a pretext. Every one of them was verifiable by them. Should I continue or- Please. Okay. Now, if the court asks you a question, you answer it. I just wanted to make sure. I'm watching the time pass here. There is a lot of different issues around the time discrepancy and the pretext. And it's not just this wealth of information that they brought in during the course of litigation. What the court needs to look at is they gave shifting justifications for her termination. That they continue to scrutinize her leave even after she did what they asked her to do, which is to explain- Because she was not trustworthy in what she was saying. Things didn't bear out. Except she had evidence to back her up. She would make a claim about something, and then they'd look at e-mails, and it just contradicted. But none of that had anything to do with why she was terminated. Of course it did. She was terminated for her time discrepancies. That's exactly what I'm telling you about. That's part of the problem, the time discrepancies. Right. But I think there are two separate issues here. I think, one, they told her, and that's backed up by what they- by Ms. Anderson's testimony and by Ms. Williams-Fontroy's testimony, that they terminated her because of her time discrepancies. Because she was untrustworthy because of her time discrepancies. Those things are tied together very closely. They're not separate. We have subsequent confirmation from Ms. Anderson to Discovery confirming, this is why you terminated me. And you have an e-mail script that was prepared by Ms. Williams-Fontroy that specifically said it contained the true reason for her termination. And as Ms. Williams-Fontroy testified, that was because of her time discrepancies. You then have Ms. Williams-Fontroy testifying that the only documents she could remember considering when making this decision were documents pertaining to the time discrepancies and Ms. Anderson's work plan, which was part of the reasonable accommodation discussion. Okay. You do have some rebuttal, and we'll hear from you then. Thank you. All right. Mr. Harris. Thank you, Your Honor. May it please the Court. My name is Mark Harris, and I represent Discovery Communications, Inc., and Lisa Williams-Fontroy. The District Court held in this case that Victoria Anderson Did Ms. Anderson have a disability that's recognized under ADA, yes or no? No. If she did, why didn't she have one that's recognized with that two- to three-hour sleep issue? In order for it to be a disability, the test, Your Honor, is that it has to be a disability that substantially limits a major life activity. Is sleep a major life activity? Yes, it is, Your Honor. However, in this case, there was simply no evidence that the type of problems she was having sleeping was in severity or in its nature. What does the record indicate in light most favorable to her is her sleeping situation? I think as the District Court found, Your Honor, although she had possibly had some problems sleeping in May 2006, every piece of objective evidence as of late 2006, when this all became an issue, November, December 2006, was that she did not have a significant problem sleeping. Her own doctors said so. There's testimony in the record from Dr. Tucker who said that as of December 19, which is the latest date, I believe there was an evaluation, she was not disabled from a sleep standpoint. She herself told her doctors a month earlier and also during that time period that she was completely functioning normally during daytime hours. I understand Your Honor spoke about the sleep issue, but that's just in response to something that Ms. Fitch said. There's no question, and she's not even arguing, I believe, that there was any problem with her functioning at her job. But Discovery took her request for accommodation, they took that as an ADA accommodation request, isn't that correct? For the reduced schedule? Right. Yes. So they took it for purposes, they considered it to be a request under ADA, correct? Yes, they evaluated it under the ADA, that's correct. Why was her suggested accommodation and why wasn't it accepted? Her accommodation that she requested- Let me say first, saying that I know your argument is you tell us they never thought she had a disqualification, although they took her accommodation request and reviewed it under ADA. Now I want to know why her request for accommodation wasn't reasonable. Just to be clear about that, that exactly is our position. Nobody thought that this was an FMLA request, and I can get into that later, but there are various reasons why no one would have possibly understood this to be an FMLA request for leave, and she didn't provide notice. We'll get into that later, maybe. I'm asking you to answer my question on ADA and the request for accommodation. Yes. She asked for a reduced work schedule, which she said would not be more than eight hours a day, not counting all kinds of breaks, such as lunch, commuting, personal needs during the day, and she would only guarantee that she would be in the office between the hours of 11 a.m. and 4 p.m., which she called core business hours. Let me ask you, is it possible that she could have given you eight hours a day working from 11 to 4? Did she have enough of a commute time to make up those other hours? Do you know? I don't know what her commute was. I believe it was in the neighborhood of total. Okay. So she said she'd guarantee she'd be there from 11 to 4. Right, and the critical point, Your Honor, is that as she herself acknowledged, her hours normally, as for most lawyers, were whatever it took to get the job done, but most of the time that was, as she described it, 8 a.m. to 8 p.m. This was a job that required her to be available for her clients, meaning parts of the business that needed to call upon her. 11 to 4, she called that core business hours. There was no such thing as core business hours, and if there were, those weren't that. Let me ask this. Was there any suggestion in her accommodation request as to what would be done with her unfinished work? No. No, I don't believe so. She had an elaborate request, which involved reorganizing, essentially, the entire department so that everybody else would take over pieces of what she did, and it was simply unworkable. There was a long back and forth, Your Honor, between her and the company, her supervisors, trying to figure out what she wanted and if there was a way to accommodate it, and there simply wasn't. Well, at some point she suggested that if she couldn't do her work, others in the department could do her work. Am I incorrect about that? No, no, you're right. That was what I was just referring to. Her proposal was that everybody else would do her work for her. The work that she couldn't do of hers that would otherwise go undone, other employees could do that work. Yes, I believe that was in her two-page request. And you found that, even if you were to consider it an ADA situation, that that request was not reasonable? Is that what Discovery thought, that request was not reasonable? Yes, and that comes under two, I guess, separate headings. One of them is that she needs to show, under the ADA, that she's qualified to do the essential functions of the job. Qualifications in a legal setting when the employee is a lawyer, as the EEOC has recognized, usually involve numbers of hours. That's how lawyers work. And she needed to be available for a certain period of time. So saying, well, I won't be able to do all my deals or I won't be able to be there during the hours that I'm needed, that is to say I can't perform the essential functions of this job. That's the qualification aspect. In terms of the other aspect, Your Honor said, which concerned – no, I'm sorry, that's my main – that is the point, is the qualification. Well, I thought you were going to also say that the accommodation was unreasonable because it burdened the employer. That's also true, yes. Yes, in both respects. Let me turn to the retaliation argument. Her argument is mainly a pretextual argument. She argues that she was given one sole reason, that's the phrase she keeps using, which was her time entries, the falsification of her time entries, for why she was terminated. But she claims that, in fact, later on the employer shifted its reasons and she also goes through a whole challenge to whether or not the time entries themselves were correct or not correct, and thinks that by means of those two arguments she can prove that there was pretext. That theory and that argument is wrong for at least three different reasons. First of all, as I think, Judge Niemeyer, you went into with her, there simply wasn't ever one sole reason being offered as her time entries. That's just a fiction that she's created, that her lawyers have created. From the very, very beginning, the reason that DCL stated for her termination, the overarching reason was untrustworthiness, and an example of that was the falsification of her time entries. She herself admitted that during her deposition. When describing what it was that she was told on that day, January 3, 2007, she said, I was told I wasn't trustworthy. In any event, if you look at the basic pattern of history here, it's quite obvious that the time entries couldn't have been the only thing, because she was already on a corrective action plan. This was imposed in October 2, 2006. She was placed on that plan because there had been a history up to that point of all of the things that Your Honor mentioned, that she couldn't speak with other members of the department or other employees without them thinking that she was changing what they were telling her, her e-mails were unreliable, she would change what they said to her. There's even, I believe, uncontested evidence in the record that her supervisor, Janelle Coles, by the summer of 2006, wouldn't even meet with her without a witness being present, because there had been too much of a pattern of Ms. Anderson changing what she was told to suit her own needs. She started showing this behavior at some point after you hired her? I mean, did she change while she was working with you? Does the record reflect that? The record reflects that every single formal evaluation that she went through said that she was not meeting expectations or needed improvement in at least one important area. This was a constant theme with her, and it was only after all of these evaluations, one after another, that in the summer of 2006... Let me ask you, if that's all true, how did she get hired in the first place then? Somebody somewhere thought she could do the job. There are two different aspects here. Ms. Fitch, in her brief... I'll tell you, there's an aspect of hiring somebody, somebody makes an assessment that she's a benefit to the company and that she can do her job. And then, apparently, you're telling me that from the get-go she couldn't do her job. No, let me explain. This is an important point. Ms. Fitch keeps talking about this as performance issues. There are two different aspects of performance. One is, can she do the basic work? Can she write the contracts that she's required to do? Either part of that performance she couldn't do from the get-go? No, that part she did. I said either part of the evaluation. You said the two parts. Can you do the work? Then there's another part in there. Yes, the second part... Could she do that part from the get-go or not? I don't think it could be determined right at the outset how she was going to interact with her supervisors. That's something that only becomes clear over time. There's no way in human resources that anybody that you have hiring, you could have any judgment on assessing that of somebody by talking to their references or interviewing them. You just take a shot in the dark and hope it works out. I don't know what was done, Your Honor, as far as that kind of vetting process, but I think if you look at the e-mails, the way she wrote them and the responses, I think it would take time for this to develop before the employer would realize, you know, she's always twisting everything that we're saying. And I also think it did get somewhat worse over time. But the performance issue, meaning how did she interact in her job environment, that was something that was raised from the very, very beginning, and that was a problem. That's why she was placed on corrective action leave. And obviously these are very important skills and features for a lawyer. How can you be a lawyer in a company when your colleagues won't trust you? Trust is one of the key things a lawyer has to provide. The second point is that these reasons never shifted. DCL never dropped that original reason. At most, it added additional examples of untrustworthiness. And the third point, let me just say related to that, the other way she tries to argue pretext is that she tries to defend her ESS entries, her time entries, to say, well, really, I was there on this day, or this is why this was wrong. There's a recent case that we sent to the court, notified the court about in a 28-J letter, I believe just yesterday. Judge said you were on the panel. This was Lange v. FedEx. This was a case decided on January 9th by this court. And what the court said very clearly, as it said in the past, is that focusing on the accuracy of the investigation, when an investigation is done to figure out whether a person is performing correctly or not, completely misses the point. That's not what the point is of the pretext analysis. The point is not whether or not she really was at work on those days or whether she really had permission to be out. The question is whether or not the employer believed that she had been. And could reasonably believe. Could reasonably believe. There is simply no evidence here that they couldn't reasonably believe that, exactly like the case was in FedEx, where there was a pattern here, and there's simply no evidence. And that really gets to my third point, which is that this is a case where there is simply no circumstantial evidence whatsoever that the real reason for her termination was retaliation. I know, of course, that a plaintiff can attempt to prove that question by means of the indirect method using pretext. But it's significant to note here that there is not a single reference in any of the emails or discussions about leading up to her termination about the fact that she had just taken leave or that she was requesting to take leave. None of that comes up. There's simply nothing. And since the ultimate question for a plaintiff is to prove whether or not the reason why she was terminated was for an improper reason, whether the reason was retaliation, she's got none of that evidence whatsoever. Let me turn quickly, Your Honor, unless there are further questions about that, to her ADA accommodation claim. I thought you already addressed that. Is that the eight-hour business? Yes, I did address that. If there are no further questions on that, let me turn then quickly to the – I just wanted to mention one thing about that in response to something that Ms. Fitch had said. The periods of time where her doctors were saying that she had sleep problems, those were all relating back, if you look very carefully at what the letters say, to the May 2006 period. There was not one continuous period of time from May 2006 right up until the end that she was suffering from these sleep problems. It's also quite clear that sleep apnea was not the reason. Her doctors, her sleep specialist said she does not have sleep apnea. On the FMLA claim – What is sleep apnea? Sleep apnea – As distinct from only getting two to three hours. Sleep apnea is a problem where a person has obstructed breathing and therefore can't get enough oxygen into their body, and as a result of that – Wakes up. Wakes up many, many times. There's some standard for the number of times you wake up in an hour over a sleep test. Yes. On average to decide if you have apnea or not. That's exactly right, and there are different gradations. There's mild and all the way up to severe. I believe the evidence in the record from her doctors was that the waking up that she had was – there was no evidence of apnea, but her waking up anyway was not frequent enough that it would have been more than a mile. I was a lawyer. I woke up many times during the night with these great ideas, and I decided to write them down on the night table so that I could have them in the morning because these ideas were so great, but I did wake up as a result of them. When I read the ideas in the morning, they were total gibberish. But I think that might have been a disorder too. On the FMLA claim, the district court found that she had not provided notice, and the law is quite clear that she has to give notice that would be reasonable to alert her employer that she was seeking leave under the FMLA. There may not be any magic words, but there is simply no notice being given that she was seeking FMLA leave at all, and there's also no question here, and I think this is important. There's no question that she was aware of the procedural requirements that she had to go through in order to obtain leave. The law says that the employer can create a protocol for how you seek leave, and she had gone through this protocol at least three or four times in the past. There's a form in the joint appendix that relates back to one of her earlier requests for leave, which she was given. She has to fill it out. On the back, it asks, are you seeking intermittent leave or reduced leave, and if so, please describe what your schedule is. She knew about that form. She didn't fill out that form in this case, and that's because she wasn't seeking leave. She wasn't seeking to be away from work. What she was seeking was to have an accommodation for her work. There was simply nothing in her request that would have put them on notice, no reference to the FMLA, no reference to leave, only references to accommodation. Your point is she did not give the proper notice, and that's clear under the record. That's correct, Your Honor. Anything else on that argument? No, that's all, Your Honor. If the Court has no further questions. All right, thank you, Mr. Harris. Ms. Fitch. Thank you, Your Honor. Hitting on a couple of points that Mr. Harris brought out, in particular the Lange case, as it was just decided, I think this case is very distinguishable from the Lange case. There, in particular, they had a comparator who was similarly situated, who had not requested leave, and who had been treated the same way. I think that's going to be very difficult for anybody's claim. Here, we have no comparators, so we're not looking at that. We're just looking at straight pretext. In the Lange case, the Court was clear that the defendant had produced voluminous evidence of Ms. Lange's transgressions, and here we don't have that. We have Ms. Cole's and Ms. Williams-Fontroy's statements about the leave discrepancies, and there is not a lot of documentary evidence to back up those allegations. And there's also a fair amount of documentary evidence in the record that contradicts them, that shows that, in fact, Ms. Anderson worked on those days in question. Wouldn't that be indicative she wasn't requesting leave? I'm talking about the time discrepancies where they're saying that she hadn't recorded her time accurately. Oh, well, I don't see how that helps one way or the other. In other words, you need some accurate information. I must say I'm not sure that's your strongest point on this case, because it looks to me, if you look at the e-mails and the correspondence, the employer was frustrated when the communications they had with Ms. Anderson. And maybe it probably wasn't her inability to write, because apparently that was a strong point for her. She could write well, and she could draft contracts, but she manipulated the correspondence to suit her own needs at the time. And reading them, I readily understood the frustration. I'm not sure you can rebuild that record and say, well, she worked sometimes when she said she didn't. That's just as indicative of the problem. It's not the fact that she was not working or not working. It's the fact that they couldn't trust the communications they had with her. They didn't know what was going on. If they wanted to supervise her work time, they at least had to have accurate data. And if they had a meeting set up, they'd like her to respond at least with respect to the arrangements originally made and not new arrangements she was saying existed. Anyway, I understand your point on it. I just don't think that's your strongest point. Well, and I would just add with respect to that that Mr. Harris basically just conceded that what Discovery did is they added justifications once this case went into litigation. He said they added examples of untrustworthiness. No, he said they added additional reasons. I don't think Mr. Harris thinks he conceded anything, quite frankly. All right, well, what I wrote down is that they said that they added additional reasons, which is correct. But whatever he said, I can almost assure you he didn't concede at that point. I don't think that. We don't need to give him any extra time to ask him. Your case is not going to rise and fall on whether or not he made a concession in his argument. No, but what I would like to say is it's very much like the case of Dennis v. Columbia Colleton because in that case there was one reason given in the deposition and then a second reason added at the trial, and the court considered that provative of pretext. I also wanted to finish up quickly with respect to Lange, that in that case the plaintiff conceded that what she'd done with her records violated policy. Can I suggest you not spend too much time on Lange? If you want to, you can. Because the record in Lange, you know, she also disputed. She said there were justifications for why they thought she had made those stops in a way that she claimed that would be impossible. She asserted, no, that under another policy that she had, that they had followed that she had done it. That's the record in that case. So I just don't think it's fair for you to have to argue against that case too much because there are facts in that case and in the record that may not be reflected in the opinion. So I don't want you to take too much of your time to worry about that if that makes sense to you. I don't think you should feel the need to distinguish that case too much. All right. Very good. What I didn't touch on was the notice of the serious health condition. I won't spend a lot of time on the serious health condition. We've already talked about the diagnoses that Ms. Anderson had. We talked about that she'd been granted six weeks of FMLA leave for her sleep disorder. And that was Discovery's conclusion, that it was a serious health condition. And as soon as she returned to work, she provided them with four or five notes that described her diagnoses, that described- Was she requesting time off? No, she was requesting a modified work schedule, which the Department of Labor- Yes. She came back requesting- All right. Well, let's not blend the two. I mean, the argument they're making is basically they were not put on notice that she was seeking leave and that there was a process that she was well aware of and she would have used that process if that's what she was doing. Well, except that they were considering the possibility of allowing her to take intermittent leave. When an employee comes back to work from six weeks of leave for a serious health condition and explains that they need a modified work schedule because of the same serious health condition, that is sufficient notice for Discovery to have considered that if they weren't going to grant this as an accommodation, then they should have granted FMLA leave. And there were discussions happening with Ms. Williams-Fontroy and with benefits about whether intermittent leave was appropriate. If, in fact, your client had made out an ADA claim which required some kind of accommodation, what's the slightest change to your client's suggested accommodation that would have met their burden? You know, they didn't accept that. You think they had to accept her suggested accommodation to meet their legal burden? No, absolutely not. All right. So what's-you know, she put out a request on how she wanted to handle it. What is the slightest change to that request that you think would have been acceptable had Discovery accepted it? They could have done a number of things. They have- But I'm asking you what is the slightest incremental change to her proposal that would make her proposal acceptable and they would have to accept it as a matter of law in this case? Well, Ms. Anderson wasn't asking to be limited to a 40-hour work week. No, 56 hours, but that doesn't- I'm sorry? Fifty-six hours over-eight hours over seven days she offered, right? She just asked for a limited eight-hour work day. Right. All she could do was work eight hours in a particular day, and that was at her doctor's recommendation. I'm sorry, my time is- Go ahead and finish to answer my question. What's the least incremental change they could have made to her suggestion that would have been sufficient, that they would have had to do it under the law? There would be an accommodation that would be reasonable that they would therefore have to accept. What would that be? The least incremental would probably have been to allow her to work on the weekends as well to get her work done. But they did also have other schedules that they could have suggested for her. I mean, there are shared jobs- But you answered my question. Okay. You answered my question. Okay. Thank you very much. We'll come down and brief counsel and then proceed on to the last case.
judges: Paul V. Niemeyer, Dennis W. Shedd, G. Steven Agee